UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tara C. McNeally,

        Plaintiff,

v.

HomeTown Bank; Lindsey Puffer, *Branch Manager and Vice President, in her individual capacity*; Shakopee Public Schools, *Independent School District No. 720*; Shakopee Public Schools Board; Michael Redmond, *Superintendent, in his individual capacity*; and Kristi Peterson, *Board Chair, in her individual capacity*,

        Defendants.

File No. 21-cv-2614 (ECT/DTS)

**OPINION AND ORDER**

---

Steven M. Cerny, Santi Cerny, PLLC, Minneapolis, MN, for Plaintiff Tara C. McNeally.

Zachary A. Alter and Sara Gullickson McGrane, Felhaber Larson, Minneapolis, MN, for Defendant Michael Redmond.

Brittany R. King-Asamoa and Jennifer G. Lurken, Gislason & Hunter LLP, Mankato, MN, for Defendants HomeTown Bank and Lindsey Puffer.

Christian R. Shafer and Adam Frudden, Ratwik, Roszak & Maloney, PA, Saint Paul, MN, for Defendants Shakopee Public Schools, Shakopee Public Schools Board, and Kristi Peterson.

---

On September 27, 2021, Plaintiff Tara McNeally attended a public meeting of the Shakopee Public Schools Board and expressed her views regarding a student-masking requirement and a proposed operating levy. After the meeting, she expressed her views concerning the in-meeting behavior of the Board's Chair. Two days later, the

Superintendent for Shakopee Public Schools, Michael Redmond, barred McNeally from being present in any part of the school district except "in the role of a parent," and her employer, HomeTown Bank, suspended her employment pending the outcome of a School District investigation. HomeTown fired McNeally on October 12. In this case, McNeally alleges that Defendants retaliated against her exercise of First Amendment free-speech rights and that Redmond tortiously interfered with her employment relationship with HomeTown.

Redmond and HomeTown seek dismissal of McNeally's Complaint under Federal Rule of Civil Procedure 12(b)(6), and their motions will be denied. McNeally alleges facts plausibly showing that Redmond and HomeTown worked together to retaliate against McNeally for her exercise of First Amendment rights and that Redmond interfered unlawfully with McNeally's HomeTown employment.

I[1]

McNeally resides in Shakopee, Minnesota, and is the mother of two children enrolled in the Shakopee Public Schools. Compl. ¶ 3 [ECF No. 1].

Defendant Shakopee Public Schools, Independent School District No. 720 (the "District") is a public school district and political subdivision of the State of Minnesota. *Id.* ¶ 6. Defendant Shakopee Public Schools Board (the "Board") governs the District. *Id.*

---

[1] In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn from McNeally's Complaint and materials embraced by it. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014); *Greene v. Osborne-Leivian*, No. 19-cv-533 (ECT/TNL), 2021 WL 949754, at *2 n.3 (D. Minn. Mar. 12, 2021), *aff'd*, No. 21-1937, 2021 WL 5121256 (8th Cir. 2021).

¶ 7.  The Board is responsible for "developing and implementing policies and procedures of the Board and the District, and for hiring, overseeing, and directing the activities" of the District's Superintendent, Michael Redmond.  *Id.* ¶¶ 7–8.  As Superintendent, Redmond "is responsible for the management and operations of the District, speaking and acting on behalf of the District, developing and administrating policies and procedures on behalf of the District, and carrying out the directives of the [] Board, the Board Chair, and its members."  *Id.* ¶ 8.  Defendant Kristi Peterson chairs the Board.  As Chair, Peterson "is responsible for the overall functioning of the Board and governing of the District, speaking and acting on behalf of the Board and the District, overseeing the work of the Board, presiding over Board meetings, determining who may speak at Board meetings and for how long, developing and approving the agenda for Board meetings, developing and implementing policies and procedures on behalf of the Board and the District, and overseeing and directing the activities of . . . Redmond."  *Id.* ¶ 9.

HomeTown operates several bank branches in Minnesota, including one branch in the City of Shakopee and another inside Shakopee High School.  *Id.* ¶ 4.  Through its relationship with the District, Hometown "periodically provid[es] bank employees to discuss financial literacy with students, provid[es] internship opportunities to students, and provid[es] other services."  *Id.*  Defendant Lindsey Puffer is the Branch Manager and Vice President of HomeTown's Shakopee locations.  *Id.* ¶ 5.  "Puffer is responsible for the management and operations of her branch locations, developing and administering policies and procedures on behalf of her branch locations, speaking and acting on behalf of her

branch locations, and carrying out the directives of the HomeTown Bank Board of Directors and Leadership Team." *Id.*

In 2020, HomeTown hired McNeally to work as a personal banker at both of its Shakopee locations. *Id.* ¶ 11. McNeally's duties "included working as a teller, opening and closing accounts, customer service, hiring, training, managing interns from Shakopee High School, [] networking," and marketing. *Id.* ¶ 12. "On several occasions, McNeally also taught financial literacy to students at Shakopee Public Schools, attending various classes at different campuses as a guest speaker." *Id.*

McNeally's twelve-year-old daughter is enrolled in the Shakopee Public Schools and has a medical condition "that is exacerbated by wearing a mask, and wearing a mask has on repeated occasions resulted in her experiencing adverse health reactions" like "shortness of breath, lightheadedness, tunnel vision, and fainting." *Id.* ¶ 14.

On August 23, 2021, the Board held a public meeting during which it discussed "pandemic response rules and procedures developed, in part, by [a] Pandemic Response Advisory Team, a committee established by the Board and whose members include Redmond and Peterson." *Id.* ¶ 15. Redmond presented a resolution that "outlined recommendations and requirements for students to wear masks in school." *Id.* The Board passed the resolution unanimously and authorized Redmond to "implement and enforce" it. *Id.*

Owing to the Board's action, when the 2021-2022 school year began, the District required McNeally's daughter to wear a mask during school. *Id.* ¶ 17. Although McNeally informed the District of her daughter's medical condition, it "was not receptive to her []

medical needs." *Id.* For several weeks, McNeally's daughter was "singled out and repeatedly harassed and berated in front of other students on a near daily basis by a teacher . . . regarding the type of mask she wore over her nose and mouth." *Id.* ¶ 18. McNeally reached out to school officials, and eventually Redmond, to stop the teacher's "harassing" behavior. *Id.* By "late August and early September 2021, the School Defendants knew that McNeally opposed their position on forcing students to wear masks in school." *Id.* ¶ 20.

McNeally began engaging with other community members about the District's mask policy. She encouraged them to "share information" about the effect of mask-wearing on children in school and to "raise awareness" about the Board's actions. *Id.* ¶ 25. McNeally co-created a Facebook group called "Parents Against Forced Masking" to generate discourse about mask-wearing, to encourage opposition to mask-wearing in schools, and to inform parents that the Board would address mask-wearing at future meetings. *Id.* ¶ 26. McNeally encouraged parents to attend the next meeting and to "share their views and positions as to why the Board should not force students to wear masks." *Id.* ¶ 28. By this time, Redmond, the Board, and Board Chair Peterson knew that McNeally had formed the Facebook group, that she opposed a "blanket mask mandate," and that she was raising awareness before the Board's next meeting. *Id.* ¶ 27.

A "large group" of parents attended the Board's September 13, 2021 meeting to voice their opposition to forced mask-wearing. *Id.* ¶ 29. Once again, Redmond presented to the Board about "recommendations and requirements for students to wear masks in school." *Id.* ¶ 30. The mask mandate wasn't the only significant issue on the Board's

September 13 agenda.  Redmond also presented in favor of a proposed operating levy that would be voted on by residents in a November 2021 election and spoke about "the consequences and budget cuts that would be made if the levy did not pass."  *Id.* ¶ 30; *see also id.* ¶ 23.  Redmond, Peterson, and other Board members favored the levy's passage.  *Id.* ¶ 23.  During the meeting, McNeally and other parents used the levy to pressure the Board on mask-wearing.  Their position, in other words, was that "if the Board was not going to give proper weight and consideration to their views and opinions, then [they] would not vote in favor of the operating levy."  *Id.* ¶ 31.  McNeally held a sign that read "MASKS = NO LEVY."  *Id.*

On September 23, Redmond visited HomeTown's location in the city of Shakopee to speak with an employee.  McNeally was working there at the time.  She asked Redmond "how a parent could get on the list" to speak at the Board's next meeting.  *Id.* ¶ 34.  Redmond instructed her to email the District offices but added, "You know, you do not want to get mixed up with that other group, you do not want to be associating with them, you have done so much in the community and worked your way up, it would be a shame if that all goes away."  *Id.*  McNeally understood "that other group" to mean parents who opposed the operating levy.  *Id.* ¶ 35.

McNeally attended the Board's next meeting on September 27.  One parent spoke to the Board about her opposition to mask-wearing and its effect on her child's medical condition.  *Id.* ¶ 36.  While the parent spoke, McNeally saw Peterson "repeatedly turn her head to look at the screen behind her"; when others spoke, Peterson turned only "once" or "not . . . at all."  *Id.*  "It also appeared to McNeally that, unlike other speakers, Peterson

6

repeatedly looked at Redmond and other Board members" and seemed "disinterested" in the presentation.  *Id.*

Afterward, McNeally and other parents took to Facebook to express their views on topics raised during the meeting.  "[D]ozens of parents" commented on a post by the official Facebook account of a member of Minnesota's House of Representatives.  *Id.* ¶¶ 38–39.  McNeally posted a comment from her personal Facebook account:

> I personally was really disappointed in board member Kristi Peterson tonight.  She was turning around to watch the clock time while Amanda was speaking about her daughters [sic] struggle with her disability and masking.  She did it multiple times!  So rude.  I know that most people don't have ill will toward these children. . . . but that lady showed she has NO HEART!  Who does that???

*Id.* ¶ 39; *see* ECF No. 17-1 at 2.

The next day, September 28, Redmond and Puffer met for lunch.  Redmond "instructed Puffer to direct McNeally to delete" the Facebook post.  Compl. ¶ 45.  During the lunch, Puffer sent McNeally a text message: "Hey . . . any way you could take down your post on Kristi Peterson?  We'll talk later about it . . . but the school is pretty upset." *Id.*  McNeally responded via text message by asking "who the school was"; Puffer replied that it was the "District offices."  *Id.* ¶ 46.  McNeally and Puffer met later that afternoon. Puffer explained that "Peterson and another Board member" were "behind the issue."  *Id.* ¶ 47.  Puffer repeated that "she had been instructed by Redmond that the school wanted the [Facebook post] taken down," adding that McNeally had "worked very hard" and did "not want it to all be for nothing."  *Id.*  McNeally refused to delete the post.  *Id.*

The next day, September 29, Puffer informed Redmond that McNeally would not delete the Facebook post. *Id.* ¶ 48. Redmond, in turn, "instructed Puffer to suspend McNeally until she deleted" it. *Id.* Later that day, Redmond emailed Puffer from his District email address, copying the District's human resources director: "As a follow up to our brief conversation, I've shared my concerns in the attached letter." *Id.* ¶ 49. Attached to the email was a letter on District letterhead and from "Superintendent Mike Redmond." *Id.* The letter stated in part:

> It has been reported to me that Tara Mcnealy [sic] has made a post on social media (I believe on Facebook) that is very inappropriate and demeaning. The subject of this post is School Board Chair, Kristi Peterson. The characterization in this post is untrue. If this same post were made by an employee of Shakopee Public Schools, it would be considered insubordination, and the event would be referred to our Human Resources Department for appropriate disciplinary action.

> * * *

> It has also been reported to me that Tara Mcnealy [sic] has reached out to some form of media and wrongly accused Kristi Peterson of contacting HomeTown Bank regarding this matter.

> Effective immediately, until such time as an investigation of this allegation has been completed by HomeTown Bank and Shakopee Public Schools, I am requesting you to direct Tara Mcnealy [sic] to not be present in the school zone, or any school building, in any capacity of the school district and bank partnership. As Ms. Mcneally [sic] is a parent of two students attending Shakopee Public Schools, she may certainly be present at Sweeney Elementary and West Middle School in the role of a parent. She may not be present in any other part of the school district, without my express permission, until the investigation is concluded.

*Id.*; ECF No. 17-1 at 2–3.[2]  Minutes after receiving Redmond's email and attached letter, Puffer called McNeally and told her that "because she would not delete the [Facebook post] and in light of the [letter] banning her from school grounds and thus banning her from working at the bank's location at the Shakopee High School, . . . she was suspended without pay effective immediately pending the outcome of the District's investigation." Compl. ¶ 50.  Puffer told McNeally there was "no longer [] a position for her at the [other] Shakopee location."  *Id.*  Puffer also said that HomeTown would be conducting its own investigation.  *Id.*

Neither the Bank Defendants nor School Defendants contacted McNeally about an investigation.  *Id.* ¶ 51.  On October 12, 2021, HomeTown terminated McNeally's employment.  *Id.*

McNeally filed this lawsuit in December 2021.  In her Complaint, she asserts one count of First Amendment retaliation under 42 U.S.C. § 1983 against all Defendants, *id.* ¶¶ 60–72, and a second count for "Tortious Interference with Employment Agreement" against Redmond in his individual capacity, *id.* ¶¶ 73–78.  McNeally alleges that Defendants played varying roles in "conspiring to secure and subsequently securing [her] suspension and termination" for engaging in First Amendment protected activity.  *Id.* ¶ 66. McNeally alleges she engaged in protecting activity by: (1) "attending the school Board meetings," (2) "holding a sign that identified her viewpoints on matters of public concern and matters that were a topic of discussion of the Board," (3) "forming a group to raise

---

[2]      Just to be clear, Redmond misspelled McNeally's name throughout his letter.

public awareness of matters that were pending before the Board," and (4) "expressing concerns of the actions of an elected official based on events that are factually accurate." *Id.* ¶ 62.  She alleges that the District, Redmond, the Board, and Peterson acted under color of state law, and that HomeTown and Puffer were "willful participants in joint activity" with them.  *Id.* ¶¶ 67–68.  McNeally also alleges that, but for Redmond's unlawful interference with her employment, she "would not have been suspended or terminated from HomeTown." *Id.* ¶¶ 74–77.  She seeks monetary and injunctive relief.  *Id.* at 29.  Redmond, HomeTown, and Puffer have moved to dismiss the claims asserted against them under Federal Rule of Civil Procedure 12(b)(6).  ECF Nos. 13, 20.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792.  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

Redmond moves to dismiss McNeally's First Amendment retaliation claim for failure to plausibly allege essential elements of the claim and on qualified immunity grounds. Each argument is considered in turn.

1

To state a First Amendment retaliation claim under 42 U.S.C. § 1983, McNeally must allege that: "(1) [s]he engaged in a protected activity, (2) the government official[s] took adverse action against [her] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016) (citation omitted).

Redmond does not dispute that McNeally engaged in protected First Amendment activity. He challenges the second and third elements, arguing that McNeally has not "plausibly show[n] Redmond . . . took (or caused others to take) an adverse action" or that his "retaliatory motive was the but-for cause of HomeTown's decision to suspend or terminate [her]." ECF No. 29 at 13–16. Redmond says the only legally sufficient adverse actions taken against McNeally were her suspension and termination, and that allegations of his involvement in those actions are conclusory and impermissibly alleged on information and belief. *Id.*; ECF No. 15 at 17–19. McNeally argues that the adverse actions sweep more broadly and include, not only her suspension and termination, but also Redmond's "threats" and his decision to ban her from District property, which she alleges

11

inhibited her ability to attend Board meetings and "from voting in the November election unless she first received [his] permission." ECF No. 27 at 19–21.

Begin with the standards for determining when conduct might "chill a person of ordinary firmness" from engaging in protected activity. According to the Eighth Circuit:

> The ordinary-firmness test is . . . designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. . . . In applying this "test," we are mindful of the words of Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982):
>
>> The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.
>
> The test is an objective one, not subjective. The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done. . . . What would a person of "ordinary firmness" have done in reaction to the [adverse action]? Would he or she have simply ignored [it], or would he or she have been slowed down, at least to some degree?

*Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003). "In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002). But an adverse action is more likely shown when an official causes the plaintiff to experience "concrete consequences." *Scheffler v. Molin*, 743 F.3d 619, 622 (8th Cir. 2014). In *Garcia*, for instance, a mayor's issuance of $35 in retaliatory parking tickets over less than two months was enough to chill a person of ordinary firmness and supported a jury verdict on the plaintiff's retaliation claim. 348 F.3d at 729.

McNeally has alleged facts plausibly showing that Redmond took or directed adverse actions that would chill the speech of a person of ordinary firmness. Redmond met with Puffer, McNeally's supervisor, and urged her to direct McNeally to delete a Facebook post critical of a Board member. Just one day later—after McNeally refused to delete the post—Redmond restricted McNeally's ability to access District property pending investigations into her conduct. *Id.* ¶¶ 45–50. This ban carried concrete consequences for McNeally. It deprived her of the ability to work at HomeTown's Shakopee High School location whether HomeTown suspended her or not. McNeally also was unable to attend Board meetings in person and, she says, prevented from "voting on the levy in the November election, unless she first obtained Redmond's permission to vote, as early votes were required to be cast at the District's office and votes were required to be cast at West Middle School on election day, an activity related to her residence in Shakopee and not her role as a parent." *Id.* ¶¶ 52, 65. A reasonable jury could find that this aspect of Redmond's conduct—his decision to exclude McNeally from District property—would cause a person of ordinary firmness to "have been slowed down, at least to some degree." *Garcia*, 348 F.3d at 729.

Redmond seems to suggest that McNeally was not actually deprived of her ability to attend Board meetings, but this is not persuasive. Redmond first asserts that his letter "said nothing which restricted [McNeally] from attending school Board meetings." ECF No. 15 at 15 n.7. It is *at least* plausible, however, that a reasonable person would understand the letter to forbid attendance at Board meetings. *Compare* ECF No. 17-1 at 2–3 ("As Ms. Mcnealy [sic] is a parent of two students attending Shakopee Public Schools,

13

she may certainly be present at Sweeney Elementary and West Middle School in the role of a parent. *She may not be present in any other part of the school district*, without my express permission, until the investigation is concluded.") (emphasis added), *with* Compl. ¶ 52 (alleging that all Board meetings were "scheduled to be held at the Shakopee High School or District Office"). Redmond also filed a news article dated October 7, 2021, reporting that the District clarified that "a parent in [McNeally's] situation can certainly attend a school board meeting." ECF No. 17-1 at 12. This isn't persuasive, either, though for a somewhat different reason: determining that McNeally could freely attend Board meetings based on an extra-pleading news article would entail drawing inferences that are not appropriate at this Rule 12(b)(6) stage. Finally, Redmond points out that Board meetings are livestreamed and available to the public on YouTube, meaning McNeally was able to view them "virtually." ECF No. 15 at 15 n.7. Redmond cites no authority to support the proposition that the option to live stream a school board meeting excuses any constitutional violations associated with forbidding a citizen's in-person attendance. Courts to consider the sufficiency of telephonic or similar alternatives for school board meeting attendance have ruled for plaintiffs asserting First Amendment claims. *See Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 549–50 (D. Vt. 2014) (holding that telephonic participation option was inadequate alternative); *Wilson v. N. E. Ind. Sch. Dist.*, 5:14-CV-140-RP, 2015 WL 13716013, at *4–6 & n.2 (W.D. Tex. Sept. 30, 2015) (holding that "permission to write the board or send a representative to the board meetings on her behalf" was inadequate alternative to in-person attendance); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, No. 1:12-cv-355, 2013 WL 143808, at *14 (S.D. Ohio Jan. 11,

2013) (holding that alternative channels of communication with board members outside of public meeting were inadequate alternatives).

Redmond argues that McNeally does not plausibly allege his involvement in her suspension and termination. This deficiency, he says, means McNeally has not pleaded the causation element of her First Amendment retaliation claim. ECF No. 15 at 18–19; ECF No. 29 at 13–16. This argument implicates general and context-specific causation principles.

To establish causation generally, McNeally "must show that a reasonable jury could find that a retaliatory motive of the government official was a 'but-for cause' of the adverse action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). "[U]nless the issue of causation is 'so free from doubt as to justify taking it from the jury,' the issue should be tried." *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1044 (D. Minn. 2010) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)); *De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 804 (8th Cir. 2022) (same). As with other retaliation causes of action, "chronology" allegations can "support [a] circumstantial claim of retaliatory action" in the First Amendment context. *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 809 (8th Cir. 2012); *see also Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) ("Temporal proximity is relevant but not dispositive.").

Also relevant here, McNeally must plausibly allege Redmond's "direct responsibility for[] the deprivation of rights." *Turner v. Mull*, 784 F.3d 485, 493 (8th Cir.

15

2015) (citation omitted).  The "requisite causal connection [between the government conduct and the deprivation] can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997) (quoting *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987)).  Courts consider the "the defendant's level of authority over and involvement in [an] adverse employment action." *Brown v. Off. of State Comptroller*, 211 F. Supp. 3d 455, 476 (D. Conn. 2016).  Further, "retaliation against protected speech can result in section 1983 liability even if it ultimately is carried out by a private actor." *Pendleton v. St. Louis Cnty.*, 178 F.3d 1007, 1011 (8th Cir. 1999).  Thus, causation may be shown by a government official's exertion of influence or authority over a private actor—*i.e.*, a plaintiff's employer—to effect some act of retaliation against a third party.  *See Helvey v. City of Maplewood*, 154 F.3d 841, 844 (8th Cir. 1998) (First Amendment retaliation claim supported by allegation that police officer "used his position of authority to cause [plaintiff's boss] to fire her in retaliation for the testimony she gave"); *Pendleton*, 178 F.3d at 1010–11 (First Amendment retaliation claim supported by allegations that state actor conspired with private employer to "force[] [plaintiff] to resign").

Here, McNeally alleges facts plausibly showing Redmond's direct participation in her suspension and termination and that a retaliatory motive was the but-for cause of those decisions.  It's reasonable to infer that the District and Redmond wield influence over HomeTown, including because "the District permit[s] HomeTown Bank to operate a

16

location at the Shakopee High School." Compl. ¶ 43. Redmond has "attend[ed] private meetings of [HomeTown's] Board of Directors" and "formed relationships with those in control of HomeTown," including Puffer, its Board, and its "Leadership Team." *Id.* McNeally also alleges facts plausibly showing Redmond drew on that influence to retaliate against her. Redmond helped to develop the District's mask-wearing policy and supported the operating levy. McNeally opposed—and generated opposition to—both. *Id.* ¶¶ 23, 30, 33. Redmond expressed his displeasure to McNeally by telling her she "did not want to get mixed up with that group" because she had "done so much in the community and worked [her] way up, [so] it would be a shame if that all goes away." *Id.* ¶ 34. And just one day after McNeally advocated her views at a Board meeting and criticized Peterson on Facebook, Redmond met with Puffer and instructed her to have McNeally delete her Facebook post. *Id.* ¶ 45. Puffer twice asked McNeally to delete the post, including during her meeting with Redmond, relaying that the "school [was] pretty upset," and then later explaining that "she had been instructed by Redmond that the school wanted the [p]ost to be taken down," and "repeat[ing], near verbatim, the same threat that Redmond had made to McNeally." *Id.* ¶¶ 45, 47. Redmond and Puffer spoke the next day "to discuss McNeally and whether Puffer was able to force McNeally to delete the [p]ost." *Id.* ¶ 48. On learning that McNeally refused, Redmond wrote a letter—not to McNeally, but to her employer—severely restricting her access to District property pending "investigations" by the District *and* HomeTown. *Id.* ¶ 49; *see* ECF No. 17-1 at 2–3 (banning McNeally from District properties "until such time as an investigation . . . has been completed by HomeTown Bank and Shakopee Public Schools"). Minutes later, alleges McNeally, Puffer suspended her

immediately and without pay based on her refusal to delete the Facebook post and Redmond's decision to restrict her access to District property, including "the bank's location at the Shakopee High School." Compl. ¶ 50. McNeally's suspension was "effective immediately pending the outcome of the District's investigation." *Id.* And, consistent with Redmond's letter, Puffer said HomeTown would also investigate McNeally's conduct. *Id.* Two weeks later, HomeTown and Puffer terminated McNeally's employment. *Id.* ¶ 51. HomeTown terminated McNeally even though she worked more often at its other Shakopee location—a location that was "short staffed." *Id.* ¶ 50. Accepted as true, these allegations plausibly show Redmond's retaliatory motive and, at minimum, that he "set in motion a series of acts" he reasonably should have known would cause McNeally's suspension and termination.

2

A government official is entitled to qualified immunity unless his "conduct violated a clearly established constitutional or statutory right of which a reasonable [official] would have known." *Moore-Jones v. Quick*, 909 F.3d 983, 985 (8th Cir. 2018) (citation omitted). "To overcome qualified immunity, the plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *LeMay v. Mays*, 18 F.4th 283, 287 (8th Cir. 2021) (cleaned up). "The Supreme Court has repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc) (citation omitted), *cert. denied*, 141 S. Ct. 1071 (2021). Still, to prevail on his motion to dismiss, Redmond must show he

18

is "entitled to qualified immunity 'on the face of the complaint.'"  *Baude v. Leyshock*, 23 F.4th 1065, 1071 (8th Cir. 2022) (quoting *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018)).

Redmond argues he is entitled to qualified immunity because McNeally has not alleged the deprivation of a clearly established right.  ECF No. 15 at 8–16; ECF No. 29 at 3–12.  McNeally counters that Redmond's actions violated her clearly established First Amendment right "to critique an elected school official."  ECF No. 27 at 25–29.  McNeally also says she was deprived of clearly established rights to "freedom of expression, to assemble, and to petition the government for a redress of grievances."  *Id.* at 26 n.13. McNeally says these rights were violated by (1) her suspension and termination; and (2) Redmond's decision to restrict her access to District property, which "banned" her from attending Board meetings or voting in the District's November 2021 election without his prior permission.

The parties disagree on the specificity with which a clearly established right must be defined.  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (citation omitted).  A plaintiff must "point to existing circuit precedent that involves sufficiently 'similar facts' to 'squarely govern'" the official's conduct "in the specific circumstances at issue, or, in the absence of binding precedent, . . . 'a robust consensus of cases of persuasive authority' constituting settled law."  *Graham*, 5 F.4th at 887 (internal citations omitted).  Courts should not "define

clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). Yet "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In other words, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

McNeally understates what it takes to show a clearly established right. McNeally reduces the inquiry to "whether [she] exercised constitutionally protected rights, and if so, then any form of retaliation is impermissible." ECF No. 27 at 25. There is no question that certain rights McNeally identifies at various points—the rights to speak on matters of public concern, to critique public officials, to vote, to assemble, and to petition the government for redress of grievances—are established in the abstract. But the proper analysis examines the "specific actions" of the official—not whether some right is clearly established "at the most general level of legal abstraction." *Sisney v. Reisch*, 674 F.3d 839, 845–46 (8th Cir. 2009) (citations omitted); *see, e.g.*, *Young v. Mercer Cnty. Comm'n*, 849 F.3d 728, 735–36 (8th Cir. 2017). Thus, the salient qualified immunity question is not simply whether Redmond retaliated against McNeally for exercising a First Amendment right, but whether the allegations plausibly show that a reasonable official in Redmond's position would have known his alleged conduct would violate a clearly established right. *See Hope*, 536 U.S. at 740–41.

20

Turning to the clearly established rights that McNeally asserts, start with allegations that Redmond conspired with school officials to have McNeally suspended and fired. A reasonable official in Redmond's shoes would have had fair notice that he could not retaliate against protected speech by exerting authority or influence over a person's employer to effect an adverse employment action against them. The Eighth Circuit has held that, "[a]s of 1989, the right to be free from government interference with an employment relation was clearly established by our court in *Chernin v. Lyng*, 874 F.2d 501 (8th Cir. 1989)." *Waddell*, 108 F.3d at 893. In *Chernin*, a federal agency denied inspection services to a meatpacking company "on the ground that the involvement of [the plaintiff], a convicted felon, rendered [its] plant unfit for operation." 874 F.2d at 502–03. The plaintiff alleged that, after bringing the denial of the company's application before an administrative law judge, the agency applied "economic pressure" and forced the company to enter a stipulation and consent decision under which it would "permanently divest [him] of any connection to its operations," "deny him access to its plant," and not consult or do business with him. *Id.* at 503. In reversing the dismissal of the plaintiff's due process claim, the Eighth Circuit held that at-will employees "have a right enforceable in law against third parties who unlawfully interfere with the employment relation." *Id.* at 504–06.

Post-*Chernin*, the clearly established right to be free from government interference with an at-will employment relationship extends to adverse employment actions that are taken in retaliation to protected speech. *See Helvey*, 154 F.3d at 844 ("Helvey's allegation that Corcoran used his position of authority to cause Thomas to fire her in retaliation for

the testimony she gave concerning the incident involving Maplewood police officers stated a [First Amendment] claim under section 1983."); *Pendleton*, 178 F.3d at 1009, 1011 (plaintiffs stated First Amendment retaliation claim and defeated qualified immunity by alleging state actor "contacted their employers to have them terminated or disciplined" and conspired with one employer, who "forced [plaintiff] to resign"); *Waddell*, 108 F.3d at 894–95 (due-process plaintiff defeated summary judgment with evidence that agency conditioned his employer's continued deposit insurance on its terminating his employment). To be sure, these cases involve dissimilar facts in some respects. None involve retaliation by a government actor for a plaintiff's criticism of an elected school official or analyzed claims against a superintendent or comparable school employee. But a clear rule does emerge: a government actor may not retaliate against an individual's protected First Amendment activity by exerting influence over her employer to cause an adverse employment action. At this stage, Redmond is not entitled to qualified immunity for his alleged role in her suspension and termination.

McNeally also contends that Redmond's decision to restrict her access to District Property violated clearly established First Amendment rights. To recap, Redmond communicated the following in his letter to Puffer:

> Effective immediately, until such time as an investigation of this allegation has been completed by HomeTown Bank and Shakopee Public Schools, I am requesting you to direct Tara Mcnealy [sic] to not be present in the school zone, or any school building, in any capacity of the school district and bank partnership. As Ms. Mcneally [sic] is a parent of two students attending Shakopee Public Schools, she may certainly be present at Sweeney Elementary and West Middle School in the role of a parent. She may not be present in any other part of

the school district, without my express permission, until the
investigation is concluded.

ECF No. 17-1 at 2–3.[3]

McNeally seems to say Redmond's action violated clearly established rights in two
respects.  First, she alleges that Redmond's letter "banned [her] from attending all future
Board meetings[,] as those meeting were scheduled to be held at the Shakopee High School
or District Office."   Compl. ¶ 52; *see also id.* ¶¶ 63, 66.   Redmond's actions caused
McNeally to "cease[] attending Board meetings." *Id.* ¶ 65.  Second, McNeally alleges she
was "banned from voting on the levy in the November [2021] election, unless she first
obtained Redmond's permission to vote, as early votes were required to be cast at the
District's office and votes were required to be cast at West Middle School on election day,
an activity related to her residency in Shakopee and not her role as a parent."  *Id.* ¶ 52; *see
also id.* ¶¶ 63, 66.  McNeally alleges that Redmond's decision to exclude her from District
property was in retaliation for her protected activity, including her viewpoint expression.
*Id.* ¶¶ 53–59, 62–63, 65, 68–70; *see also id.* ¶ 70 (alleging Redmond acted "in furtherance
of a policy, custom, and practice of ignoring, suppressing, and silencing the views of

---

[3]      It's not clear if, when, or how Redmond withdrew the restrictions described in his
letter.   McNeally asserts she "was never contacted by the District pursuant to an
investigation, and thus the ban is still in place . . . ."  ECF No. 27 at 12 n.3.  In her
Complaint, McNeally alleges she was "never contacted" by any Defendant about an
investigation, Compl. ¶ 51, and the District, the Board, and Peterson admit that the District
did not conduct one, Joint Answer ¶ 26 [ECF No. 19].  At this stage, the pleadings permit
a reasonable inference that, as of the time she filed suit, no Defendant had informed
McNeally that the letter's restrictions were lifted.

parents who oppose the School Defendants' agenda, and intimidating, targeting, threatening, and retaliating against parents who oppose their views and opinions").

Start with the impact on McNeally's ability to attend school board meetings, which requires a broader overview of the law governing public access to property. The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (quoting *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981)). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44. "Limited public forums (sometimes called nonpublic forums) include public properties that are not by tradition or designation public forums but have been opened by the government for limited purposes, communicative or otherwise." *Powell v. Noble*, 798 F.3d 690, 699 (8th Cir. 2015) (citation omitted). A public-school district's use of an otherwise nonpublic venue, such as school or district property, to conduct public school board meetings creates a limited public forum. *See, e.g.*, *Green v. Nocciero*, 676 F.3d 748, 753 (8th Cir. 2012); *Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021). A limited public forum may be "limited to use by certain groups or dedicated solely to the discussion of certain subjects," but the government's restrictions must be "reasonable and viewpoint-neutral." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (citation omitted). "[A] restriction on access to a limited public forum must be 'reasonable in light of the purpose served by the forum.'" *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904,

24

920 (D. Minn. 2021) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

Binding and persuasive authorities show that the right not to be excluded from a public board meeting in retaliation for First Amendment activities is clearly established. Start with the Supreme Court's decisional law, from which "[g]eneral statements of the law" may provide "fair and clear warning that an official's actions are unlawful." *Morris v. Zefferi*, 601 F.3d 805, 812 (8th Cir. 2010) (cleaned up). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). More pointedly, the Supreme Court has held that "when [a] [school] board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of . . . the content of their speech." *City of Madison, Joint Sch. Dist. No. 8. v. Wisc. Pub. Emp. Rels. Comm'n*, 429 U.S. 167, 175–76 (1976). In *City of Madison*, "[t]he First Amendment was violated when [school board] meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 281 (1984). Thus, Supreme Court precedent makes clear that the First Amendment prohibits "the selective closure of a generally open forum"—including a public school board meeting. *Id.* Our Eighth Circuit has reinforced these limits on denying access to public school board meetings. In *Green v. Nocciero*, the Court observed that a school board "could reasonably restrict public access to [its meeting] 'based on the subject matter of the speech, on the identity or status of the speaker, or on

the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand.'"   676 F.3d at 753 (quoting *Victory Through Jesus Sports v. Lee's Summit R–7 Sch. Dist.*, 640 F.3d 329, 334–35 (8th Cir. 2011)).   This ability, it continued, "necessarily included the authority to remove an unruly or disruptive member of the audience 'to prevent his badgering, constant interruptions, and disregard for the rules of decorum.'"   *Id.* (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004)). "But having chosen to conduct its business in public and to hear citizen views, the Board *could not deny access to the meeting* and, while it could limit the subject matter of citizen comments, *it could not discriminate against a speaker based on his viewpoint*."  *Id.* at 754 (emphasis added).   These cases gave fair and clear warning to a reasonable official in Redmond's position that denying access to a public-school board meeting in retaliation to someone's (1) criticism of a school board member on Facebook and (2) advocacy for an opposing view on matters before the school board—here, the District's mask-wearing policy and a proposed operating levy—would violate a person's clearly established First Amendment rights.  *See also Johnson v. Perry*, 859 F.3d 156, 175–76 (2d Cir. 2017) (finding clearly established right "not to be excluded, based on viewpoint differences or because of possible annoyance," from accessing school's gymnasium during use as limited public forum); *Reza v. Pearce*, 806 F.3d 497, 506 (9th Cir. 2015) (rejecting qualified immunity and observing "fundamental principle that the government can remove an individual from a limited public forum only if the individually actually disrupts the proceedings").

To show that the denial of access to Board meetings did not violate a clearly established right, Redmond cites a decision granting qualified immunity to school board members who prohibited a plaintiff from attending board meetings, attending a school's extracurricular activities, and being physically present on the school's campus. *See Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 140–41 (3d Cir. 2017). In *Barna*, the school board's action followed disruptive behavior and threats by the plaintiff at an earlier meeting, issuance of a letter warning the plaintiff that "he could attend [b]oard meetings but would be banned from future attendance if he engaged in threatening or disorderly conduct," and the plaintiff's failure to heed this warning by behaving disorderly at a subsequent meeting. *Id.* at 140. In its qualified immunity analysis, the court carefully (and consistently) described the at-issue right as the "right to participate in school board meetings *despite engaging in a pattern of threatening and disruptive behavior*." 877 F.3d 136, 141, 143, 144 (3d Cir. 2017) (emphasis added). The court concluded that "given the state of the law at the time of the Board's ban, there was, at best, disagreement in the Courts of Appeals as to the existence of a clearly established right to participate in school board meetings despite engaging in [such] behavior." *Id.* at 144. This case is materially different. There are no allegations that McNeally was denied access to Board meetings for threatening or disorderly behavior.

## B

HomeTown and Puffer advance essentially two reasons why McNeally has not stated a § 1983 First Amendment retaliation claim against them. First, they say McNeally has not alleged the deprivation of a constitutional right. ECF No. 22 at 6–9. As discussed,

27

McNeally has plausibly alleged the deprivation of her clearly established right to be free from adverse employment actions caused by government interference with her at-will employment relationship. This conclusion applies equally to her claims against HomeTown and Puffer. Second, HomeTown and Puffer say McNeally has not alleged facts plausibly showing their willful participation in a conspiracy with Redmond, the District, the Board, or Peterson. ECF No. 22 at 9–15; ECF No. 31 at 4–16. HomeTown and Puffer assert that McNeally's conspiracy allegations are "conclusory" and fatally reliant on mere "parallel conduct." ECF No. 22 at 9–13.

A private actor may be held liable under § 1983 if it is a "willful participant in joint activity with the State or its agents." *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)). "[B]oth state officials and private actors may be liable under § 1983 for conspiring to retaliate against protected speech, if the evidence shows the requisite agreement to violate or disregard the law." *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005) (citing *Pendleton*, 178 F.3d at 1011). "[A] plaintiff must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy." *Id.* "[A]lleging that two people had the *opportunity* to conspire—i.e. that they could have met with each other, or called each other, or emailed each other—is obviously not sufficient to 'nudge[]' a conspiracy claim 'across the line from conceivable to plausible.'" *Lawrence*, 740 F. Supp. 2d at 1050 (quoting *Twombly*, 550 U.S. at 570) (emphasis in original); *see Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th

28

Cir. 2014). But "[t]he elements of a conspiracy are often established through circumstantial evidence, and 'the question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights' can be inferred from the circumstances to demonstrate a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 845 (D. Minn. 2021) (citation omitted).

Here, the Complaint's allegations permit a plausible inference that a meeting of the minds occurred between Puffer and Redmond to retaliate against McNeally for her protected activity. This case is unlike *Lawrence*, on which the Bank Defendants rely, because McNeally alleges more than mere opportunity and parallel conduct. As discussed, the allegations plausibly show Redmond's influence over HomeTown, his support for the mask-wearing policy and proposed operating levy, and his displeasure with McNeally's efforts to oppose those measures (*i.e.*, her viewpoint). Critical to showing a meeting of the minds are the events following McNeally's Facebook post. Redmond met with Puffer the next day, and during that meeting Puffer asked McNeally to delete the post because the District offices were "pretty upset." Compl. ¶¶ 45–46. Later that day, Puffer confirmed that Redmond wanted the post taken down and repeated "near verbatim" his earlier threatening remark. *Id.* ¶ 47. When McNeally refused, Redmond and Puffer spoke again the next day. Redmond instructed Puffer to suspend McNeally until the post was deleted. *Id.* ¶ 48. When Redmond excluded McNeally from District property, he didn't communicate with her—he emailed Puffer. And he did so as a "follow up to [their] brief discussion" and with a letter articulating his decision. *Id.* ¶ 49. Puffer called McNeally "within minutes" of receiving Redmond's letter and suspended her without pay. *Id.* ¶ 50.

Puffer did not allow McNeally to continue working at HomeTown's other Shakopee location, even though it was "short staffed" and where McNeally "worked the majority of her time and worked full-time when the Shakopee High School location was closed." *Id.* HomeTown terminated McNeally just two weeks later. *Id.* ¶ 51. Together, these allegations propel McNeally's conspiracy claim across the line from conceivable to plausible.

C

Redmond has moved to dismiss Count Two of the Complaint, in which McNeally alleges tortious interference with an employment agreement. *Id.* ¶¶ 73–78. Redmond argues that the claim fails on official immunity grounds and because McNeally has not alleged facts plausibly showing essential elements of the claim.

Start with official immunity. Redmond contends that McNeally has not pleaded malice. ECF No. 15 at 22. Under Minnesota law, "official immunity protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong."[4] *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn. 1991) (citation omitted). Malice "means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Ulrich v. Pope Cnty.*, 715 F.3d

---

[4]     Minnesota's common law does not grant official immunity to officials "charged with the execution of ministerial, rather than discretionary, functions." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 505 (Minn. 2006) (citation omitted). McNeally does not argue that any aspect of Redmond's alleged conduct was ministerial. ECF No. 27 at 33 n.14.

1054, 1062 (8th Cir. 2013) (quoting *Rico*, 472 N.W.2d at 107).  The malicious wrong

exception to official immunity "anticipates liability only when an official intentionally

commits an act that he or she then has reason to believe is prohibited."  *Rico*, 472 N.W.2d

at 107.  An official-immunity determination "contemplates less of a subjective inquiry into

malice, which was traditionally favored at common law, and more of an objective inquiry

into the legal reasonableness of an official's actions."  *Hassan v. City of Minneapolis*, 489

F.3d 914, 920 (8th Cir. 2007) (en banc) (quoting *State by Beaulieu v. City of Mounds View*,

518 N.W.2d 567, 571 (Minn. 1994)); *accord Smith v. City of Minneapolis*, 754 F.3d 541,

549 (8th Cir. 2014).  Official immunity is a distinct doctrine, but "federal decisions

interpreting qualified immunity under section 1983 . . . are instructive" and "the legal

reasonableness of the official's actions is relevant to whether the public employee

committed a wilful or malicious wrong."  *Rico*, 472 N.W.2d at 108; *see also Passenheim

v. Tolbert*, No. 15-cv-422 (PJS/SER), 2016 WL 6915504, at *5 (D. Minn. Nov. 21, 2016)

(official immunity analysis did not "differ in any material respect from qualified-immunity

analysis" under the case's circumstances).  "[W]hether an officer acted maliciously is

usually a question of fact for the jury."  *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664

n.5 (Minn. 1999).

　　　Here, the Complaint includes allegations plausibly showing malice.  Many of the

same allegations supporting a "clearly established right" for qualified immunity purposes

establish the objective unreasonableness of Redmond's actions.  In other words, allegations

plausibly showing that Redmond violated a clearly established First Amendment right also

show he "ha[d] reason to know that [his] challenged conduct [was] prohibited."  *Anderson*

*v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 662 (Minn. 2004).  Drawing all inferences in McNeally's favor, a reasonable juror could conclude from the facts alleged that Redmond knowingly violated her First Amendment rights by causing her suspension and termination.

Redmond's remaining challenge is that McNeally has not plausibly alleged certain elements of her tortious interference claim.  The parties agree that to state a claim for tortious interference with contract under Minnesota law, McNeally must prove: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (citation omitted).  Relevant here, "a tortious interference claim will lie for an at-will employment agreement." *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991).  "Minnesota courts protect an at-will employee from a tortiously[-]procured discharge even though that discharge does not breach any contract." *Conrad v. Xcel Energy, Inc.*, No. 12-cv-2819 (PJS/FLN), 2013 WL 1395877, at *4 (D. Minn. Apr. 5, 2013).

Redmond's arguments implicate the claim's third and fourth elements.  He first contends he is not plausibly alleged to have intentionally procured a breach.  ECF No. 15 at 23; ECF No. 29 at 18–19.  This element, Redmond points out, requires McNeally to "prove that [Redmond] *caused* [HomeTown] to breach its contract" with her.  *Qwest Commc'ns Co. v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018); *see Jensen v. Lundorff*, 103 N.W.2d 887, 891 (Minn. 1960) (requiring defendants' conduct to have proximately caused the breach).  Redmond's causation argument mirrors his

32

causation argument on McNeally's § 1983 claim.  And the same allegations allowing a plausible inference that Redmond caused a violation of McNeally's clearly established rights create a plausible inference that Redmond's actions were a proximate cause of her suspension and termination.

Redmond next argues that McNeally has not plausibly alleged his actions were without justification.  ECF No. 15 at 24–25; ECF No. 29 at 19.  "Liability for wrongful interference may be avoided by showing that the defendant was justified by a lawful object which he had a right to assert."  *Spice Corp. v. Foresight Mktg. Partners, Inc.*, No. 07-cv-4767 (JNE/JJG), 2011 WL 6740333, at *18 (D. Minn. Dec. 22, 2011) (quoting *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 897 (Minn. 1965)).  "Generally, a defendant's actions are justified if it pursues its legal rights via legal means."  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008).  "Ordinarily, whether interference is justified is an issue of fact, and the test is what is reasonable conduct under the circumstances."  *Kjesbo*, 517 N.W.2d at 588; *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (same).  Although described as an element of the tort, "[t]he burden of proving that interference with a contract was justified is on the defendant."  *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015) (citation omitted).

Redmond offers justifications for his decision to ban McNeally from District property.  He points out, for instance, that "Minnesota law permit[s] school officials, like Redmond, to limit access to school grounds.  *See* Minn. Stat. § 123B.02, subds, 1, 5a; Minn. Stat. § 609.605, subd. 4(d)."  ECF No. 29 at 19.  He also cites District policy providing that "[a]n individual . . . may be denied permission to visit a school or school property . . . if

33

the visit is not in the best interest of students, employees[,] or the school district." *Id.*; *see* ECF No. 30-1.   There are problems with this argument.   Redmond's justifications, whatever they might be, are not relevant at the Rule 12(b)(6) stage.   If that weren't so, Redmond identifies no justification for his alleged influence on the actions comprising McNeally's tortious interference claim: her suspension and termination.   *See* Compl. ¶¶ 73–78.   McNeally has plausibly alleged that Redmond's retaliation caused those employment decisions, and Redmond offers no "lawful object" or "legal right" to justify his alleged procurement of them.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.   Defendant Michael Redmond's Motion to Dismiss [ECF No. 13] is **DENIED**.

2.   Defendants HomeTown Bank and Lindsey Puffer's Motion to Dismiss [ECF No. 20] is **DENIED**.

Dated:  June 21, 2022                    s/ Eric C. Tostrud
                                         Eric C. Tostrud
                                         United States District Court