# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Tara C. McNeally,

      Plaintiff,

v.

HomeTown Bank; Lindsey Puffer, *Branch Manager and Vice President, in her individual capacity*; Shakopee Public Schools, *Independent School District No. 720*; Shakopee Public Schools Board; Michael Redmond, *Superintendent, in his individual capacity*; and Kristi Peterson, *Board Chair, in her individual capacity*,

      Defendants.

Civ. No. 21-2614 (JWB/DTS)

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

J. Ashwin Madia, Esq., and Zane A. Umsted, Esq., Madia Law LLC; Steven M. Cerny, Esq., Santi Cerny, PLLC, counsel for Plaintiff.

Brittany R. King-Asamoa, Esq., and Jennifer G. Lurken, Esq., Gislason & Hunter LLP, counsel for HomeTown Bank and Lindsey Puffer.

Adam Frudden, Esq., and Christian R. Shafer, Esq., Ratwik, Roszak & Maloney, P.A., counsel for Shakopee Public Schools, Shakopee Public Schools Board, and Kristi Peterson.

Sara Gullickson McGrane, Esq., and Zachary Aaron Alter, Esq., Felhaber Larson, counsel for Michael Redmond.

## INTRODUCTION

Tara McNeally, a bank employee, had been public and vocal in opposing the enforced use of masks in public schools during the COVID-19 pandemic. But she had a job working for the bank inside a public school that required masking to protect students

and staff. McNeally's activism and anti-masking confrontations contributed to her eventual employment termination.

McNeally sued several parties, including the Superintendent of Shakopee Public Schools (Michael Redmond), McNeally's direct employer (HomeTown Bank ("the Bank")), her immediate supervisor at HomeTown Bank (Lindsey Puffer), the Chair of the School Board (Kristi Peterson), the Shakopee Public Schools Board, and the Shakopee Public Schools ("the District"). Her lawsuit alleges First Amendment retaliation under 42 U.S.C. § 1983. She also accuses Redmond of tortiously interfering with her employment agreement.

The Defendants are categorized into three groups: (1) Superintendent Redmond; (2) HomeTown Bank and Lindsey Puffer ("the Bank Defendants"); and (3) Kristi Peterson, the School Board, and Shakopee Public Schools ("the School Defendants"). Each group separately moved for summary judgment. McNeally also filed a partial motion for summary judgment against Redmond, HomeTown Bank, and Puffer, asserting violations of her rights.

McNeally's claims fail on all counts. It was the Bank—her actual employer—that suspended and terminated her and not Superintendent Redmond or the School Defendants. A § 1983 claim as asserted here may be maintained against *state* actors, like Redmond and the School Defendants, if they retaliated against McNeally because of the content of her speech. The evidence does not support a retaliation claim. As to the Bank Defendants, a § 1983 claim can be asserted against a *private* entity, such as a bank, if the evidence shows that the state actors and the Bank colluded to act adversely against

McNeally because of her speech content. The record does not support collusion. For these reasons, and as developed below, McNeally's partial motion for summary judgment is denied and Defendants' motions for summary judgment are granted.

## FACTUAL BACKGROUND

Starting in 2017, the Shakopee Public Schools Board selected and partnered with HomeTown Bank to serve as a business role model for its students. The Bank maintained eleven branches across Minnesota at that time. The Bank agreed to provide Shakopee Public Schools ("the District") $300,000 in donations and in-kind contributions, including externships and internships, guest speakers, and student development programs. In turn, the District agreed to name its Academy of Business & Entrepreneurship after the Bank, and designated space on its Shakopee High School property for the Bank to operate the "School Branch."

McNeally worked at the Shakopee Branch of the Bank and was later hired as the only bank employee at the School Branch. In 2021, during the COVID-19 pandemic, she worked about six hours per week at the School Branch when it was open. The rest of her work week was spent at the Bank's Shakopee Branch. The Bank, and not the District, paid her salary and supervised her work. The District, including Superintendent Redmond, had no contractual authority to hire or discipline Bank employees.

At the School Branch, McNeally had several job responsibilities, including hiring and managing student interns earning academic credit; educating students on financial literacy; guest speaking in classes; and serving as a bank teller. An overarching requirement of her job was to positively represent HomeTown Bank, to be a goodwill

ambassador, in the Shakopee Public Schools through her various engagements in the District.

It was three years into this partnership when the COVID-19 pandemic hit, prompting Minnesota government officials to close schools and businesses, limit gatherings, and enact mask mandates as safety measures. COVID-19 policies varied throughout 2020 and 2021, as science, research, and debate evolved, with schools alternating between remote learning and in-person learning with masking requirements. On June 30, 2021, the mask mandate was lifted in Minnesota. But within the next month, the Centers for Disease Control and Prevention and the American Academy of Pediatrics recommended reinstating masking with the emergence of the COVID Delta variant and given the vaccination ineligibility of children under twelve. Local school districts were granted the discretion to set masking policies for themselves.

That summer, the District, including the School Board, considered whether to require masking for students and employees for fall 2021. The School Board, after considering recommendations from an advisory group and receiving COVID-19 health data, unanimously chose to require masking for elementary students in August 2021. But public input was divided. Some parents wanted a mask requirement for all students while others wanted parents to have the right to make the masking decision for their children.

Besides the masking policy, a School Board proposal for an operating levy to support necessary District funding was slated for a November 2021 vote. Some parents, including McNeally, leveraged the operating levy vote to obtain greater support for their positions opposing masking.

Following the School Board vote and enactment of the masking policy in the fall of 2021, McNeally confronted School Board Chair Kristi Peterson about the masking policy at a September 1, 2021 parent-teacher event at West Middle School, a school within the District. Peterson described McNeally's speech as yelling, which McNeally denies. (Doc. Nos. 62, 103, Decl. of Zachary A. Alter ("Alter Decl."), Ex. K, McNeally Depo. at 86). Peterson said it "wasn't a civil discourse conversation." (*Id.*, Ex. L, Peterson Depo. at 47–48, 60.) McNeally says she told Peterson: "[E]ven though you don't know who they are, you feel like you're able to just medically treat my children. And I don't appreciate it. So, [McNeally said], I hope that you change your mind on the masking policy. And if so, I will be glad to vote yes to the levy." (McNeally Depo. at 86.) Peterson listened and then told McNeally that she would research the matter. (Peterson Depo. at 47–48, 60.)

Six days later, McNeally engaged in another confrontation over masking. McNeally was attending a meet-and-greet event in the District at Sweeney Elementary School. She was present in an official capacity, promoting the Bank's interest at the event by handing out brochures. She was also present as a member of the Sweeney Elementary Parent Teacher Organization ("PTO"). Wearing a mask was mandatory at the school, though McNeally was not wearing one. When she was confronted disapprovingly by a member of the PTO for not wearing a mask, a pitched exchange ensued. McNeally ultimately stated that it was her body and her choice and she stormed out of the event. The school principal was present during the exchange, and he reported the disturbance to Superintendent Redmond. Of McNeally's conduct and involvement, the principal in

expressing his concern over McNeally's behavior stated that he "came close to calling the police to have [McNeally] removed, but eventually she left on her own accord." (Doc. No. 62, Alter Decl., Ex. J, Redmond Depo. at 159.)

The masking policy was discussed again at the next two School Board meetings. At the September 13, 2021 meeting, McNeally held a sign that said "MASKS = NO LEVY." (Doc. No. 76, Decl. of Tara C. Mohr ("McNeally Decl.") ¶ 7.) At the September 27, 2021 meeting, parents spoke again on the masking issue. At this meeting, the School Board adopted a new resolution by a 6-1 vote, requiring masking for elementary and high school students.

Following the September 27 meeting, McNeally posted a comment in a public discussion on a Minnesota legislator's Facebook page ("the Facebook Post" or "the Post"):

> I personally was really disappointed in board member Kristi Peterson tonight. She was turning around to watch the clock time while Amanda was speaking about her daughters struggle with her disability and masking. She did it multiple times! So rude. I know that most people don't have ill will toward these children . . . . but that lady showed she has NO HEART! Who does that???

(Doc. No. 62, Alter Decl., Ex. D.) McNeally's Facebook Post came to the attention of Superintendent Redmond. Redmond had a pre-arranged meeting with Bank branch manager Lindsey Puffer on the next day, and he did raise concerns about McNeally's recent confrontations within the District over the masking policy. (Redmond Depo. at 157–64; Doc. No. 62, Alter Decl., Ex. I, Puffer Depo. at 187–88.) He and Puffer discussed the confrontation between McNeally and Peterson at the September 1 parent-

teacher event. Redmond also informed Puffer about the September 7 incident at Sweeney Elementary.

They also discussed McNeally's Facebook Post from the previous night criticizing School Board Chair Peterson. Redmond noted the negative tone of the Post. Redmond asked as a business partner if Puffer could talk to McNeally about removing the Post, emphasizing, however, that she should handle the situation as she saw fit. (*See* Puffer Depo. at 188–89.) Puffer later did make a request to McNeally that she consider deleting the Post given the District's concerns. McNeally refused. And then she went a step further in escalating the situation.

Rather than delete the Post, McNeally instead talked to a news reporter from Alpha News. She told him that School Board Chair Peterson had contacted the Bank to try to force the removal of her Facebook Post. Peterson had not contacted the Bank and the statement was untrue. Peterson then received an inquiry from Alpha News about McNeally's accusation. Peterson, unaware of the Facebook post until then, denied having contacted the Bank.

Redmond did inform Puffer of the misinformation McNeally had provided to Alpha News. He also expressed concern over McNeally's general behavior given her role that directly interacted with students. During this conversation, Puffer told Redmond that the Bank would be investigating McNeally's conduct and that she would be placed on a leave of absence pending the investigation. (Redmond Depo. at 172–73.) Puffer also asked Redmond to put his concerns in writing.

After his discussion with Puffer, Redmond "hastily" wrote a letter following up on

their conversation. (*Id.* at 172.) The letter expressed Redmond's concerns and barred

McNeally from school property pending the Bank's investigation of her conduct.

Redmond explained that he did this because of his concern "due to the erratic behavior

incidents and this most recent Alpha News," and because he "really didn't think it was a

good idea for her to be in direct contact with students within our schools." (*Id.*)

> The September 29 letter from Redmond reads:
>
> It has been reported to me that Tara Mcnealy [sic] has made a post on social media (I believe on Facebook) that is very inappropriate and demeaning. The subject of this post is School Board Chair, Kristi Peterson. The characterization in this post is untrue. If this same post were made by an employee of Shakopee Public Schools, it would be considered insubordination, and the event would be referred to our Human Resources Department for appropriate disciplinary action.
>
>      . . . .
>
> It has also been reported to me that Tara Mcnealy [sic] has reached out to some form of media and wrongly accused Kristi Peterson of contacting HomeTown Bank regarding this matter.
>
> Effective immediately, until such time as an investigation of this allegation has been completed by HomeTown Bank and Shakopee Public Schools, I am requesting you to direct Tara Mcnealy [sic] to not be present in the school zone, or any school building, in any capacity of the school district and bank partnership. As Ms. Mcnealy [sic] is a parent of two students attending Shakopee Public Schools, she may certainly be present at Sweeney Elementary and West Middle School in the role of a parent. She may not be present in any other part of the school district, without my express permission, until the investigation is concluded.

(Doc. No. 62, Alter Decl., Ex. D.) The School Board did not know about or approve this

letter. Redmond informed the School Board of his letter after it was sent. The School

Board did not discuss or take any action relating to it.

8

Puffer discussed the McNeally situation with the Bank President and a human resources representative. The Bank suspended McNeally on the same date as the Redmond letter and began its investigation into her conduct. The District did not conduct a separate investigation. Neither Redmond, nor anyone from the District, took any role in the Bank's investigation.

At the time of the suspension, Puffer told McNeally that Peterson was not the person who had contacted the Bank about her Post. (McNeally Depo. at 135.) Still, McNeally continued to repeat the Peterson misinformation, including to another media outlet. (Doc. No. 68, Aff. of Brittany King-Asamoa ¶ 5, Ex. D at deposition Ex. 13 (October 7, 2021 article).)

During the two weeks after McNeally's suspension, the Bank received hundreds of harassing calls threatening Bank staff and their families related to the McNeally suspension and the masking issue. (Puffer Depo. at 248–49.) Because of the threats, the Bank had to close the School Branch on October 6 and 8, and disconnected the phones at the Shakopee Branch on October 9, 2021. (King-Asamoa Aff. ¶ 18, Ex. Q; Puffer Depo. at 249; Doc. No. 83, Decl. of Adam J. Frudden ¶ 23, Ex. 25 at 7.)

Other concerns were more directly related to McNeally during the investigation. Bank employees said that McNeally threatened to "take everyone down" with her. (King-Asamoa Aff. ¶ 15, Ex. N at 6.) Given the nature of the environment, employees asked that McNeally not be allowed to return to work. (*Id.*) Apart from challenging the District's masking policy, the Bank learned in its investigation that McNeally had also

been making negative comments to co-employees at the Bank about their mask usage. (Puffer Depo. at 248.)

The investigation concluded with multiple findings: that McNeally had violated the Bank's standards of conduct; she had violated the Bank's internal social media guidelines; she could not perform certain job duties because of the ban from school property; and she had made improper use of work time. On October 12, 2021, based on its investigation and findings, the Bank terminated McNeally from all Bank branch facilities.

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A genuine dispute of material fact exists when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding summary judgment, the record is considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).

### II.    Analysis

#### A.     First Amendment - Retaliation Claim

McNeally alleges unlawful retaliation for protected speech in violation of the First Amendment against all Defendants. To establish a First Amendment retaliation claim, McNeally must prove that (1) she engaged in protected activity, (2) a government official

took an adverse action against her that would chill a person of ordinary firmness from continuing in the activity, and (3) the protected speech was not only a motivating factor in the government official's decision to take the adverse employment action, but the "retaliatory animus" caused plaintiff's injury. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021).

> ### 1.      HomeTown Bank and Lindsey Puffer ("the Bank Defendants")

The Bank investigated McNeally after learning of various incidents involving McNeally in September 2021, and terminated her for violating the Bank's standards of conduct and social media policies, not performing her job duties because of the ban from school property, and for improper use of work time. McNeally alleges that Puffer (and therefore HomeTown Bank) conspired with Redmond to have her banned from school property, suspended from work, and ultimately terminated from her employment for exercising her First Amendment rights, and that the Bank Defendants are liable for conspiring under 42 U.S.C. § 1983.

Generally, only state actors can be liable under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). A private person can be liable under § 1983 if that person willfully participated in joint activity with a state actor to deprive the plaintiff of a constitutionally protected right. *Id.* at 152. To proceed under the joint action theory, a plaintiff must show that the public and private actors shared a common, unconstitutional goal. *Stagman v. Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999).

Here, there is no evidence of an agreement or shared unconstitutional goal between the Bank Defendants and Redmond, the only arguable state actor, to suspend

and terminate McNeally in retaliation for the comments made by her on her "MASKS = NO LEVY" sign or her Facebook Post (the speech underlying McNeally's claims). McNeally's conclusion that Redmond and Puffer hatched a plan to retaliate against her during their lunch meeting, and that their follow-up communication and Redmond's letter temporarily banning McNeally from school property was simply a step in their plan, is not supported by the record. *See Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 845 (D. Minn. 2021) ("Allegations that the parties had an 'opportunity to communicate' or 'acted in a manner that was consistent with the existence of a conspiracy' are insufficient[.]").

After Puffer was informed that McNeally had made a false report to the media, Puffer told Redmond that *the Bank* would be placing McNeally on a leave of absence while *the Bank* investigated her conduct. This message was relayed to Redmond *before* he sent a letter temporarily and partially banning McNeally from school property. The ban set forth in Redmond's letter was limited to McNeally's capacity as an employee of the Bank within the District, which in effect added nothing meaningful to the Bank's own suspension of her from all Bank locations, which included the School Branch, pending the investigation.[1]

---

[1] This matter presented before a different judge on Defendants' motion to dismiss. In the order denying Defendants' motion to dismiss, the district court—based on the pleadings—found it *plausible* for a person to understand the letter to forbid attendance at Board meetings or to forbid McNeally from coming onto school property to vote without prior permission. (*See* Doc. No. 37 at 13–14.) The plain language of the letter, however, says: "I am requesting you to direct Tara Mcnealy [sic] to not be present in the school zone, or any school building, *in any capacity of the school district and bank partnership*." (Doc. No. 62, Alter Decl., Ex. D (emphasis added).) The paragraph describing the restrictions placed on McNeally must be read within the context of that statement. Even

Absent is any evidence that anyone from the District asked the Bank Defendants to suspend and later terminate McNeally, or to discipline her at all. And even if Puffer and Redmond shared information about McNeally and discussed removal of the Facebook Post, this does not show that Puffer and Redmond together devised a plan to suspend or terminate McNeally from her employment. *See Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir. 1997) (stating that to survive a motion for summary judgment, evidence must be produced from which reasonable jurors could conclude that there was a "meeting of the minds"). Instead, the record reveals that the suspension and termination were done by McNeally's employer, the Bank. (*See* Doc. No. 58, Aff. of Robert Southworth ¶ 3.) There is no proper evidence of a meeting of minds to take adverse action against McNeally.

It is worth underscoring that McNeally was working on school grounds then, with direct contact with and supervisory oversight for students. Redmond, as the Superintendent, could be expected to raise concerns when someone working on school grounds, interacting and overseeing students, had been acting erratically and might act to impair the health and safety of students. "Because schools act *in loco parentis* for students, . . . school officials can reasonably predict that parents and students will fear the influence of controversial conduct on the learning environment[.]" *Riley's Am. Heritage*

---

so, the matter is now being considered after discovery and on summary judgment. The record is even clearer that the ban was limited to McNeally's capacity as a Bank employee. The evidence reflects the District clarified before the next School Board meeting that a parent in McNeally's situation could attend School Board meetings. And McNeally indeed did attend and vote in the November 2021 election on school grounds. McNeally has presented no evidence the ban was to be interpreted more broadly.

*Farms v. Elsasser*, 32 F.4th 707, 725 (9th Cir. 2022) (citations omitted). Redmond's concern about a Bank employee's impact on students' health and safety during the COVID-19 pandemic aligned with his responsibilities as a school system superintendent. *Cf. Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1183 (S.D. Fla. 2021) ("[S]chools have a legitimate interest in promoting the health and safety of its students, which extends to efforts to reduce the spread of COVID-19 among students and school employees.") (quotations omitted). Redmond's following up on his concerns was therefore reasonable and in line with his own job duties, not evidence of collusion with the Bank.

Nor is there any evidence that Redmond threatened the Bank with any consequence if McNeally were not suspended or terminated. And if Redmond's letter could be read to imply that McNeally should be disciplined in some way, a mere suggestion by Redmond is not evidence of a meeting of the minds, as required for § 1983 liability. *See Tirado*, 521 F. Supp. 3d at 845 ("[M]ere suggestions from one party to another are insufficient to establish a meeting of the minds."). Instead, the evidence reflects that when Puffer contacted Redmond for clarification on the letter, Redmond stated that he could be convinced to allow McNeally back on school property in her prior capacity, depending on the outcome of the investigation. (Redmond Depo. at 224; Puffer Depo. at 252.)

The evidence also reflects that McNeally's termination was solely the Bank's decision, based on concerns that went beyond McNeally's work in the District, following the Bank's independent investigation. The termination mirrored McNeally's status as an

at-will employee at the Bank. *See Mudlitz v. Mut. Serv. Inc.*, 75 F.3d 391, 393–94 (8th Cir. 1996) (stating that under the general rule of employment contract law in Minnesota, a person serving as an at-will employee can be terminated at any time with or without cause).

Without facts showing collusion between the Bank Defendants and Redmond to retaliate against her for her speech, McNeally has not shown that the Bank Defendants' actions were taken under color of state law. Therefore, her claim fails, and the Bank Defendants' motion for summary judgment is granted.

### 2.    Michael Redmond

Redmond is a government official when acting in his superintendent capacity and could be held liable under § 1983 if McNeally engaged in protected speech and Redmond took an adverse action against her that would chill a person of ordinary firmness from making similar speech.

### a.  McNeally's Speech is Protected Speech

Although McNeally spoke several times and at different forums about the District's masking policy, the speech that is the basis for her First Amendment retaliation claim is her School Board meeting sign ("MASKS = NO LEVY") and her Facebook Post. It is undisputed that McNeally was speaking as a citizen when holding her sign and when making the Post. And at least arguably, she was speaking on a matter of public concern since masking of school children in response to COVID-19 was of public concern in the fall of 2021, as was the School Board Chair's conduct during a School Board meeting concerning masking. *See Davenport v. Univ. of Ark. Bd. of Trustees*, 553

F.3d 1110, 1113 (8th Cir. 2009) (stating that speech is entitled to First Amendment protection if the person spoke as a citizen, and not as an employee, on a matter of public concern); *see also Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir. 2000) (stating that matters of political, social, and other concern to the community, as well as speech criticizing a public employee in their capacity as a public official address matters of public concern). Therefore, McNeally did engage in protected speech.

### b.  No Adverse Action

McNeally must also show that Redmond took an adverse action against her that would chill an ordinary person from continuing in speech like hers. *See Nieves*, 139 S. Ct. at 1722. McNeally's claims against Redmond are based on three alleged adverse actions.

First, McNeally asserts that when she approached Redmond on September 23, 2021, to ask how a parent could speak at a School Board meeting, Redmond responded to her with a warning to not "get mixed up with that other group of people." (McNeally Depo. at 92.) She claims he also made a veiled threat, stating that she "had done a lot in the community" and "worked hard to get to where [she] was," and that "it would be a shame if that were to all go away." (*Id.*) Redmond disputes those statements, and instead asserts that he responded explaining the process for public comment and for signing up to speak. (Redmond Depo. at 147.)

These statements made by Redmond to McNeally, even if they did occur, are not, in and of themselves, adverse actions. The statements may explain Redmond's thoughts about McNeally at that time. But they are not alone adverse actions on which a First Amendment retaliation claim may lie. *See Whiting v. City of Athens*, No. 3:23-cv-220,

2023 WL 6881065, at *6 (E.D. Tenn. Oct. 18, 2023) (finding the conversation between two people was not an adverse action that could support a First Amendment retaliation claim because the words did not cause plaintiff to "suffer a threat to his economic livelihood"); *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 9511178, at *8 (N.D.N.Y. Oct. 30, 2017) (finding vague threats that lacked the specificity and seriousness to deter the plaintiff from exercising his First Amendment rights were not adverse actions); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (stating courts have declined to find "criticism, false accusations, or verbal reprimands" as adverse actions to support a First Amendment retaliation claim).

Second, McNeally contends that Redmond conspired with Puffer to suspend and terminate her and that the suspension and termination constitute adverse actions for which Redmond can be held liable. For the reasons stated above, there is no evidence that Redmond (or anyone from the school) asked or pressured the Bank to take any action—whether to suspend, terminate, or even to discipline McNeally.

That leaves the third alleged adverse action—Redmond's ban of McNeally from school property. McNeally asserts that Redmond's ban caused her to be suspended and later terminated, and, in McNeally's view, banned her from attending School Board meetings and from voting in the November election. Although the evidence reflects that Redmond acted in his capacity as school superintendent when he instituted the ban, the evidence does not show the limited ban imposed was an adverse action.

Changes in conditions that cause "no materially significant disadvantage" are "insufficient to establish the adverse conduct required." *Harlston v. McDonnell Douglas*

*Corp.*, 37 F.3d 379, 382 (8th Cir. 1994); *see also Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (quotations omitted). The limited restriction imposed by Redmond, restricting McNeally's ability to enter school grounds in her capacity as a Bank employee, in effect was to occur regardless because the Bank on the same day suspended her employment at all branch locations pending the investigation. And, as explained above, the limited restriction did not preclude McNeally from speaking at School Board meetings or voting.

The ban was only temporary pending the outcome of the investigation. Unlike the Bank's suspension, the ban did not (and could not) preclude her from working at any of the other Bank branch locations, including the Bank's Shakopee Branch where she had been employed for some time. Therefore, Redmond's ban did not materially change McNeally's working conditions. Because the change in conditions caused by the ban did not disadvantage McNeally in a material way, the ban is not an adverse action. McNeally's First Amendment claim asserted against Redmond fails.

### c.  The Protected Speech did not Motivate Redmond's Decision

Even if McNeally could show that the ban from school property was an adverse action, McNeally must also prove that her protected speech was a motivating factor and *actually caused* Redmond's decision to temporarily ban her. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory

motive." *Nieves*, 139 S. Ct. at 1722 (emphasis in original); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) (stating that while it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

McNeally contends Redmond's motivation for the ban was her Facebook Post, and that Redmond was trying to stop her from speaking on public forums or at School Board meetings and to eliminate her employment at the Bank's school location because of the content of her speech. McNeally points to Redmond's letter, which recites the Post and does not mention safety concerns, and her termination meeting with the Bank, where the Post was discussed.[2]

McNeally's assertion, however, is not supported by the evidence. Even if there were some level of animus by Redmond reflected in his letter, the record reflects that the impetus for the letter was Redmond's concern that McNeally was working directly with students on school property after exhibiting what he felt was erratic behavior. This included one instance that nearly required police intervention, and another that concerned a false report to a media outlet. McNeally ignores her report to Alpha News, which is significant in that it occurred after McNeally's Facebook Post. She also does not address what Redmond believed at the time, including that her Alpha News report about Peterson was false. Redmond testified that if it were only the Facebook Post, then he would not

---

[2]     The Bank's termination letter listed other reasons for McNeally's termination in addition to not performing her job duties because of the ban and for violation of social media policy. Moreover, the reasons given for her termination are evidence of the Bank's motivations, not Redmond's motivations, since he was not involved with the Bank's termination decision.

have talked about an investigation. (Redmond Depo. at 169, 170–71, 219); *see Nieves*, 139 S. Ct. at 1722 ("[An] action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."); *see also Ackerman v. Iowa*, 19 F.4th 1045, 1059 (8th Cir. 2021) (stating a plaintiff cannot establish but-for causation when an "independent, non-retaliatory" event takes place between protected activity and subsequent adverse action).

Although McNeally tells a different version of what happened at the various events, her version was not relayed to Redmond prior to his decision and therefore does not create genuine issues of material fact for trial. For the First Amendment retaliation analysis, what Redmond reasonably believed is what matters. *See Waters v. Churchill*, 511 U.S. 661, 677 (1994) (stating that "employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer *reasonably* found them to be") (emphasis in original).

The evidence shows the ban was limited, temporary, implemented for an investigation into McNeally's escalating behavior, and would have been instituted regardless of the content of McNeally's Facebook Post. McNeally has not presented evidence that creates a material fact dispute. Therefore, McNeally fails to meet the causation requirement for a First Amendment retaliation claim against Redmond.

### d. The Retaliation Claim against Redmond Fails under *Pickering*

Because Redmond is a government actor, McNeally's First Amendment claim might also be addressed under the *Pickering* framework. Following *Pickering v. Board of Education of Township High School District 205, Will County.*, 391 U.S. 563 (1968),

courts have applied a more deferential standard to government entities when considering
retaliation claims based on speech by employees. *See, e.g.*, *Smith v. Cleburne Cnty.
Hosp.*, 870 F.2d 1375, 1381 (8th Cir. 1989) (applying *Pickering* to an independent
contractor relationship). When determining whether to apply *Pickering*, courts consider
whether the parties have a relationship analogous to that between an employer and
employee, even if there is not a direct salaried employment relationship. *Id.*; *see also
Heritage Constructors, Inc. v. City of Greenwood*, 545 F.3d 599, 601 (8th Cir. 2008)
(stating *Pickering* applies if the plaintiff was a regular provider of services to the
government defendant); *Kinney v. Weaver*, 367 F.3d 337, 360–61 (5th Cir. 2004)
(applying *Pickering* to instructors). If the parties have such a relationship, courts balance
the government's interests in efficient performance of public services against a person's
free speech rights. *See Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir.
2011).

Although McNeally was employed by HomeTown Bank, she worked on school
property and provided services for the school, including managing student interns,
speaking in classes, and teaching financial literacy. The educational services McNeally
provided to the District implicate the type of heightened government interests that justify
applying the *Pickering* framework to a retaliation claim. *See Riley's Am. Heritage Farms*,
32 F.4th at 716; *Kinney*, 367 F.3d at 360–61.

Under the *Pickering* framework, McNeally's interests as a citizen commenting on
matters of public concern are weighed against the Superintendent's interest in promoting
efficient public services in the school district. *See Nord v. Walsch Cty.*, 757 F.3d 734, 740

(8th Cir. 2014). Factors considered include the degree of public concern, whether the speech impeded the ability to perform jobs, the importance of coworker relationships, the need for workplace harmony, the time, place, and manner of the speech, and context around the dispute. *Raposa v. Meade Sch. Dist. 46-1*, 790 F.2d 1349, 1352 (8th Cir. 1986).

As for schools in particular, a certain harmony is needed to educate students, and "[u]ndercurrents of hostility and ill will in the classroom can undermine the educational process." *Id.* That said, actual disruption need not take place before a school is allowed to take action. *Connick v. Myers*, 461 U.S. 138, 152 (1983).

Weighing the above factors, Redmond's interests prevail. Redmond had cause to be concerned about McNeally's behavior being disruptive considering multiple disruptions within the school or at school functions over masking; McNeally working in a supervisory, mentor, and teacher role at the school; and because of McNeally's confrontations over masking that had escalated during a one-month span. Redmond testified that he "was worried about someone working directly with students who . . . had been reported to have exhibited erratic behavior now on multiple times." (Redmond Depo. at 162.) Based on the evidence presented, it was reasonable for Redmond to be concerned that McNeally's effect on the students and staff he was charged as superintendent to protect might be unsupportive of the masking policy.

When weighed against McNeally's free speech interests, Redmond had good reason to issue a ban to protect against disruptions on school premises by McNeally— "undercurrents of hostility and ill will" that might undermine the educational process—

during the Bank's investigation. *Cf. Melzer v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 336 F.3d 185, 199 (2d Cir. 2003) ("Any disruption created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the balancing test and which may outweigh a public employee's rights."). Redmond's ban promoted efficient public services and was limited, measured, and occurred within the context of the Bank suspending McNeally from all branch locations during its investigation. McNeally's free speech interests were not curtailed during that time. Considering all the factors, Redmond's interests prevail.

For all the above reasons, McNeally's First Amendment retaliation claim against Redmond fails both under a standard First Amendment analysis and under *Pickering*.

### e. Qualified immunity

Qualified immunity is an immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Its purpose is to allow government officials the ability "to make reasonable but mistaken judgments about open legal questions." *Lyons v. Vaught*, 875 F.3d 1168, 1171 (8th Cir. 2017). To withstand qualified immunity at summary judgment, (1) a plaintiff must assert a violation of a constitutional or statutory right; (2) that right must have been clearly established at the time of the violation; and (3) given the facts most favorable to the plaintiff, there must be no genuine dispute over whether a reasonable official would have known that the alleged action violated that right. *See Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999). Courts must review the facts known to the public official to determine whether they "reasonably should have known that their actions, in light of those facts, would violate the law." *Domina v. Van Pelt*, 235 F.3d

1091, 1098 (8th Cir. 2000).

Here, there is no clearly established law that a superintendent cannot temporarily ban a person employed on school grounds from school property in their employee capacity with a private employer during an investigation into their allegedly improper conduct. *See, e.g.*, *JTH v. Mo. Dep't of Soc. Servs.*, 39 F.4th 489 (8th Cir. 2022) (stating the law is not clearly established enough to cover the alleged retaliatory investigation); *see also Sexton v. Martin*, 210 F.3d 905, 914 (8th Cir. 2000) (stating that where *Pickering*'s fact-intensive balancing test is at issue, an asserted First Amendment right "can rarely be considered clearly established" under a qualified immunity standard). Instead, "school officials have broad discretion in restricting visitors on school property to protect the safety and welfare of the school children." *Embry v. Lewis*, 215 F.3d 884, 889 (8th Cir. 2000); *cf. Gunter v. N. Wasco Cty. Sch. Dist. Bd. of Educ.*, 577 F. Supp. 3d at 1156 ("[A] parent may justifiably be expected to act in the child's best interest. But it is that very motivation—laudable in itself—that might lead the parent to misjudge what is best for the health of the community as a whole. That is precisely why we, as a society, have entrusted public institutions to make such decisions.") (quotations omitted).

The evidence supports that Redmond was concerned about McNeally continuing to work directly with students considering her recent behavior and was acting in the students' best interest. Indeed, it is hard to imagine a scenario where a school would not be just as interested in suspending a non-employee working within the school who is under investigation and being suspended by their own employer for misconduct. McNeally has not presented evidence otherwise. The law is not clear that under these

circumstances Redmond's actions violated McNeally's rights. For these reasons,

Redmond has qualified immunity over McNeally's First Amendment retaliation claim.

### 3.    Kristi Peterson

An individual defendant cannot be held liable under § 1983 unless she was

personally involved in causing the deprivation of a constitutional right. *Mayorgo v.*

*Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006). McNeally presents no evidence that

Peterson took any adverse action against her, and her assertion that Peterson participated

in or had influence over any of the adverse actions taken is only speculation. Even if

Peterson were upset about McNeally's Facebook Post (which she admittedly was), and

had complained to the Bank or Redmond, no evidence shows that any of the adverse

actions were taken because of a complaint from Peterson. In other words, there is no

evidence of but-for causation. McNeally presents no evidence that Peterson

communicated directly with anyone at the Bank before McNeally's termination, and

Peterson testified that she was unaware of any School Board member or District

employee having a plan with the Bank Defendants to suspend or terminate McNeally.

(Peterson Depo. at 63–64.)

Peterson interacted with McNeally only once, at the September 1, 2021 middle

school parent-teacher meet-and-greet event when McNeally confronted Peterson about

the masking policy. There is no evidence that Peterson knew that the person who

confronted her at this event was the same person who had later made the Facebook Post

about her. There is also no evidence that Peterson was aware of Redmond's conversation

with Puffer, the Redmond letter, or the letter's contents, and the evidence reflects she

learned of the letter only after it was sent. The only other evidence involving Peterson was that she informed Redmond that Alpha News had contacted her, and that she responded to Alpha News saying that she had not contacted the Bank about McNeally.

None of this is evidence of personal involvement by Peterson in any adverse action taken against McNeally. Without evidence of personal involvement by Peterson, McNeally's First Amendment retaliation claim against her fails. It is also not clearly established that Peterson's response to McNeally at the middle school event, Peterson's alleged complaint about the Facebook Post (even if made), Peterson's report to Redmond that a media outlet had contacted her, and Peterson's response to that media outlet violated McNeally's rights. Peterson is therefore also entitled to qualified immunity. For this added reason, McNeally's claim against Peterson fails and Peterson's motion for summary judgment is granted.

### 4.    Shakopee Public Schools/School Board

Because McNeally's First Amendment retaliation claim against the School Board is asserted in the School Board's official capacity, that claim is no different in its analysis than the claim against the School District. Therefore, these claims are addressed together.

The School District "cannot be held liable under section 1983 for an injury inflicted solely by its employees or agents on a theory of respondeat superior." *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998). The School District can only be held liable under § 1983 for "an official municipal policy or a widespread custom or practice that caused the plaintiff's injury." *Id.*

In Minnesota, a superintendent is not an authorized policymaker for the school

district, and therefore § 1983 precludes a claim against the district for a superintendent's actions under the "official policy" theory. *Id.* at 652; *see* Minn. Stat. § 123B.143, subd. 1 (not granting the superintendent policymaking authority). No District policy identified here supports retaliating against individuals who speak negatively about or advocate against District employees, School Board members, or their positions.

As to custom or practice, "[a]n alleged illegal custom [or practice] must be widespread and may only subject a school district to liability if it is pervasive enough to have the 'force of law.'" *Artis v. Francis Howell N. Band Booster Ass'n*, 161 F.3d 1178, 1181–82 (8th Cir. 1998). Generally, a single incident cannot by itself establish liability. *See, e.g.*, *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). In addition, a plaintiff must show deliberate indifference to or tacit authorization of such conduct by the policymaking official after notice to the official of the misconduct. A plaintiff must also show that she was injured by acts by the governmental entity's custom or practice—meaning that the custom or practice was the moving force behind the constitutional violation. *Springdale*, 133 F.3d at 653.

McNeally has not shown a custom or practice. While some people criticized the School District's masking policy, from the record none had limits placed on their ability to access District property—or were otherwise retaliated against—because of their speech, including others who commented on social media. McNeally points to a School Board member's beliefs about Chair Peterson's conduct, and generally that member believes the anti-masking contingent was bullied by those who supported masking. None of this shows that the School Board had a custom or practice of retaliation against those

who did not support masking. McNeally also points to another person's statement that Redmond told him to put on a mask at a School Board meeting, and that the assistant superintendent asked him where he worked. But neither the superintendent nor the assistant superintendent was a member of the policy-making body (the School Board), and neither comment shows that the District had a custom or practice to retaliate against people based on their mask-wearing views.

The only alleged adverse action taken by a person affiliated with the District was the letter sent by Redmond, temporarily banning McNeally from school property. The School Board had no part in that. Nor were they involved in the Bank's investigation, suspension, or termination of McNeally either. Without evidence supporting a District policy, custom, or practice, McNeally's First Amendment retaliation claim against the School District and the School Board fails. The School Defendants' motion for summary judgment is granted.

### B.  Tortious Interference Claim against Redmond

McNeally's only other claim is that Redmond tortiously interfered with her employment agreement with the Bank. To prove tortious interference with contract, McNeally must prove: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

McNeally cannot show that Redmond intentionally procured termination of her employment with the Bank. To meet this element, McNeally must show that Redmond "*caused* the breaching party to breach its contract." *Qwest Commc'ns Co. v. Free*

*Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018) (emphasis in original). "Mere knowledge that a decision might affect other parties' contracts is not the same as intentional, unjustified interference." *Spice Corp. v. Foresight Mktg. Partners, Inc.*, Civ. No. 07-4767, 2011 WL 6740333, at *19 (D. Minn. Dec. 22, 2011). The evidence reflects that the Bank terminated McNeally based on the results of its own independent investigation—and not at the urging or by Redmond's design. The Bank's concerns went beyond McNeally's performance in the District. There is no evidence that Redmond "intended" for McNeally to be suspended or terminated from her employment at the Bank. There were several branches of the Bank other than the School Branch where McNeally possibly could have continued to work. No reasonable factual inferences support a conclusion that Redmond intended to procure a breach of McNeally's employment agreement. Therefore, Redmond's motion for summary judgment on the tortious interference claim is granted.

## ORDER

Based on the file, record, and proceedings, and for the reasons stated above,

**IT IS HEREBY ORDERED** that:

1.     Defendant Michael Redmond's Motion for Summary Judgment (Doc. No. 59) is **GRANTED**;

2.     Defendants HomeTown Bank and Lindsey Puffer's Motion for Summary Judgment (Doc. No. 64) is **GRANTED**;

3.     Plaintiff Tara C. McNeally's Motion for Partial Summary Judgment (Doc. No. 72) is **DENIED**;

4.      Defendants Shakopee Public Schools, Shakopee Public Schools Board, and Kristi Peterson's Motion for Summary Judgment (Doc. No. 78) is **GRANTED**; and

5.      Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE** in its entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: March 25, 2024                          *s/ Jerry W. Blackwell*
                                              JERRY W. BLACKWELL
                                              United States District Judge